J-A01015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| WALTER BRICE | : | No. 2721 EDA 2022 |

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001124-2020

BEFORE:   LAZARUS, P.J., PANELLA, P.J.E., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:                    **FILED JUNE 25, 2024**

The Commonwealth of Pennsylvania appeals from the order, entered in the Court of Common Pleas of Philadelphia County, granting Walter Brice's motion for extraordinary relief and ordering a new trial. Upon careful review, we reverse the order, reinstate Brice's convictions, and remand for sentencing.

The trial court set forth the factual and procedural history of this matter as follows:

> The Commonwealth asserted that[,] on June 13, 2019, in the area of 1400 South Hicks Street, [Philadelphia, Brice] parked a black Honda Accord, exited the vehicle, and waited. Approximately ten minutes later, [Kwane] Glover ("Glover") arrived driving a Ford Flex, parked by a corner store, and entered the store. The Commonwealth asserted that [Brice] approached Glover and began firing a firearm. Glover was shot once in the leg. Police arrived on the scene not long after and soon identified a black

---

[*] Retired Senior Judge assigned to the Superior Court.

Honda Accord. Officers ran the vehicle tags and determined that the vehicle belonged to [Brice]. Officers searched the vehicle and discovered receipts for a store named Lou's Wholesale[,] where their investigation yielded surveillance footage that showed [Brice] at Lou's Wholesale previously that day. Although he had been acquainted with [Brice] prior to the day in question, Glover, when interviewed by police, failed to identify [Brice] as the shooter.[2]

[2] In addition to not identifying [Brice] as the person who shot at him when interviewed by police, Glover testified during the jury trial that [Brice] was not the person who fired a gun at him, nor was [Brice] present at the scene of the incident and that the Commonwealth was prosecuting the wrong person.

A trial by jury commenced on April 25, 2022[,] and continued through April 29, 2022, at which time the jury found [Brice] guilty of aggravated assault, carrying a firearm without a license, carrying firearms in public in Philadelphia, and possession of an instrument of crime. [Brice] was not found guilty of being a person prohibited to possess a firearm. Notably, the convictions came at the beginning of jury deliberations, after April 28, 2022, when the [assistant district attorney Christian] Wynne [("ADA")] said the following during closing argument:

ADA Wynne: We are in District Attorney Larry Krasner's DA office. Do you really think that me, as a Black woman, sitting here would be prosecuting another Black person if we didn't think this is what—

ATTORNEY ALTSCHULER: Objection.

Attorney Altschuler ("Defense Counsel") immediately objected to the comment, which this court sustained. The [ADA] finished closing arguments, after which Defense Counsel moved for a mistrial. This court discussed the matter with both attorneys outside the presence of the jury, even permitting the [ADA's] supervisor to provide input regarding the issue of the [ADA's] racially charged argument. This court discussed the possibility of granting a mistrial based on the [ADA's statement].

ADA WYNNE: Judge, can I run to my supervisor?

THE COURT: At this point, you can tell your supervisor, but I—

ADA WYNNE: They're at the door.

THE COURT: —already made my ruling about the mistrial.

ADA WYNNE: That's fine.

THE COURT: Go ahead. Call your supervisor, but hurry because I want to bring the jury out.

(Short recess.)

THE COURT: Okay. Is there anything—hi, how are you?

ADA PESCATORE: Hi, Judge. How are you?

THE COURT: I'm not sure if you need us to tell you anything.

ADA PESCATORE: No, I pretty much got it. Good afternoon, Your Honor. Joanne Pescatore for the Commonwealth.

THE COURT: Good afternoon, supervisor.

ADA PESCATORE: Judge, I would just like to know on the record what the curative instruction will sound like, just so we're aware.

THE COURT: Yes. I was going to say that the—as you know, the prosecutor mentioned something about Larry Krasner's climate right now and that do you really think a DA, [] a female Black district attorney is going to prosecute another Black person if it weren't true? And I'm going to say, that any reference—first of all, that it was stricken. And because I struck it, it has to be stricken from their minds.

ADA PESCATORE: Okay.

THE COURT: And that it is highly inappropriate for them to consider that and that they should not consider that in their . . . juror deliberations for one iota.

ADA PESCATORE: Okay. What about what [defense counsel] said about [ADA Wynne]?

THE COURT: He did not say anything about her. He said the Commonwealth. You know, normal. It was normal verbiage.

ADA PESCATORE: Right. And that wasn't fair response to what counsel said, Judge?[4]

THE COURT: I don't think so.

ADA PESCATORE: Excuse me?

THE COURT: Not that a Black district attorney—first of all, not referencing the climate and Larry Krasner's office, and then saying that a Black female district attorney is not going to prosecute a Black—

ADA WYNNE: Or any person, Judge.

THE COURT: —defendant if it weren't true. I'm sorry. That is—I mean, I'm not granting a mistrial.

ADA PESCATORE: Okay.

THE COURT: But I could possibly. But I'm not going to do that but I think a curative instruction is needed.

ATTORNEY ALTSCHULER: Again, if I can find out what was the fair response to? Do you really think a Black woman would prosecute a Black man, what was that a fair response to?

ADA WYNNE: Fair response—

ATTORNEY ALTSCHULER: To interject race—

THE COURT: Let me tell you something—

ATTORNEY ALTSCHULER: —in the middle of the trial.

THE COURT: I want to tell you, she's been a great lawyer. She did a great closing. But that it kind of just got away from her and that shouldn't have been said. But it needs a curative.

ADA PESCATORE: Okay. That's fine, Judge.

THE COURT: You know, I'm not saying—she did a great job in her closing except that cannot be said.

ADA PESCATORE: Well, sometimes, you know, when things are said at you for a whole week, you know, that's your response, Judge. [] I understand your ruling. [] And I know Ms. Wynne understands your ruling.

ADA WYNNE: Yes.

THE COURT: Thank you.

[4] It is one thing for a defense attorney to make disparaging remarks about the quality of the Commonwealth and/or police officers' investigation, witnesses, and case. It is quite another matter for the Commonwealth to use [its] authority to make racially charged remarks that prejudice the inalienable rights of the accused charged with a crime.

[N.T. Trial, 4/28/22, 160-64.]

. . .

After these discussions, this court delivered a cautionary instruction to the jury in an attempt to ensure that they did not consider the [ADA's] racially charged language. []

. . .

Although this court initially determined that such instruction would be sufficient, on October 25, 2022[,] this court later granted [Brice's] motion for extraordinary relief in the form of a new trial. This was not a decision this court made lightly, but rather only after careful consideration of the effect the racially charged closing argument had on the jury and how the curative instruction, as delivered, would not have erased such an argument from the minds of the jurors prior to their deliberations.

Trial Court Opinion, 2/28/23, at 1-6 (some footnotes omitted).

The Commonwealth filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The Commonwealth raises the following claim for our review:

Did the [trial] court err by granting a motion for extraordinary relief and a new trial based on a prosecutor's statement at closing argument [that] was a fair response to the defense attorney's personal accusations, caused no prejudice to [Brice], and any hypothetical error would have been harmless where there was unequivocal video evidence establishing [Brice's] guilt?

Brief of Appellant, at 4.

Initially, we note that in reviewing a claim of improper prosecutorial comments, our standard of review "is whether the trial court abused its discretion." *Commonwealth v. Hall*, 701 A.2d 190, 198 (Pa. 1997). Additionally,

> with specific reference to a claim of prosecutorial misconduct in a closing statement, it is well[-]settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well[-]settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Commonwealth v. Jones*, 191 A.3d 830, 835–36 (Pa. Super. 2018), quoting *Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa. Super. 2016) (quotation marks, quotation, and citations omitted). Prosecutorial misconduct is evaluated under a harmless error standard. *Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa. Super. 2015).

Here, the Commonwealth first argues that the court abused its discretion in granting Brice a new trial, as the prosecutor's statements during closing arguments were "made in fair response to the unprofessional accusations that defense counsel had repeatedly made to the jury that the prosecutor was trying [Brice] for no reason and with no evidence." Brief of Appellant, at 12. The Commonwealth asserts that

> the defense attorney told the jury in his closing that the prosecutor hid witnesses from them and speculated, without evidence, that a witness who did not testify would have testified favorably for [Brice]. [Defense counsel] accused the prosecutor of asking the victim to "lie" and attempting to prepare the [victim] to "lie and blame Mr. Brice." He also speculated that the prosecutor would tell the jury to "ignore what the witnesses are saying" and "ignore the evidence," and that she would make "misrepresentations" in her argument. He further stated that her closing argument would be misleading and that she was "pathetic."

*Id.* at 14. The Commonwealth concedes that, "[w]hile the prosecutor's statement may have been inartful, it must be evaluated in the context [in] which it was given." *Id.* In support of its argument, the Commonwealth cites our Supreme Court's decision in **Commonwealth v. Carson**, 913 A.2d 220 (Pa. 2006). There, defense counsel stated that the prosecutor would "do anything or say anything in order to engineer a guilty verdict in a case." *Id.* at 238. In response, in his closing argument, the prosecutor stated, "Well, if I were that type of a guy, you would probably see about ten eyewitnesses up there all having been paid in full." *Id.* The appellant argued that the prosecutor had improperly vouched for himself; the Supreme Court rejected that argument, concluding that it was "fair response to defense counsel's

largely improper and baseless implication that the prosecutor would behave unethically, or indeed, criminally, in order to win cases." *Id.*

The Commonwealth asserts that the trial court's reliance on ***Commonwealth v. Scarfo***, 611 A.2d 242 (Pa. Super. 1992), is inapt. That case involved the prosecution of several alleged members of the mafia. On appeal, the appellants challenged the prosecutor's reference to them in his closing statement as "wolves" and a "wolf pack." ***See id.*** at 283. The Court held that these comments "exceeded the bounds of propriety and constituted an appeal to the passions and prejudices of the jury." ***Id.***, quoting ***Commonwealth v. Lipscomb***, 317 A.2d 205, 205 (Pa. 1974). As such, the Court concluded that trial court had erred in refusing to grant a mistrial.

The Commonwealth argues that

> [t]he instant case is not close to what happened in ***Scarfo***. The prosecutor's statement here never accused *defendant* of doing anything outside of what the evidence proved. It was more akin to the statement in ***Carson***, ***supra***, which involved bolstering commentary in fair response to the defendant's argument.
>
> . . .
>
> The statement had neither the intent nor effect of creating bias or hostility against *defendant* and it did not impede the jury's ability to weigh the evidence objectively.

Brief of Appellant, at 16-17, 19 (emphasis in original).

The Commonwealth further argues that, even if the prosecutor's statement was unwise, it did not deprive Brice of a fair trial and did not harm him, particularly in light of the fact that the trial court struck the statement from the record and issued a cautionary instruction. Citing to the video

evidence that captured Brice's movements before, during, and after the shooting, the Commonwealth argues that "the evidence of [Brice's] guilt was virtually airtight." *Id.* at 17. The Commonwealth asserts that this evidence "was overwhelmingly inculpatory, uncontradicted, and was [] obviously [the] major basis for [Brice's] conviction. The prosecutor's statement at closing was *de minimis* in light of the overwhelming evidence that the jury saw of [Brice] before, during, and after the shooting." *Id.* at 19.

In response, Brice argues that the prosecutor's statement was "a wildly inappropriate plea that the jury ignore the evidence and instead focus their deliberations on the race of the parties and their counsel." Brief of Appellee, at 7. He asserts that the statement was an "inflammatory and prejudicial" expression of the prosecutor's opinion, of the type that has been "explicitly proscribed by our Supreme Court." *Id.* Brice refers us to a series of cases in which the Supreme Court "reversed convictions where a prosecutor has suggested that she believes the defendant is guilty under far less egregious circumstances than at issue here." *Id.* at 10, citing ***Commonwealth v. Joyner***, 365 A.2d 1233 (Pa. 1976) (new trial ordered where prosecutor referred to defendant as "the leader of this pack of murderers" and stated "[i]t is perfectly clear that this man is guilty"); ***Commonwealth v. Smith***, 385 A.2d 1320 (Pa. 1978) (new trial ordered where prosecutor referred to defendant as "vicious, desperate criminal who would kill for a nickel"); and ***Commonwealth v. Anderson***, 415 A.2d 887 (Pa. 1980) (new trial ordered

where prosecutor referred to defendant as "executioner" who committed an "assassination"). Brice argues that

> the prosecutor did not merely imply that she believed [Brice] was guilty. She told the jury that she, as a Black woman, would not have prosecuted [him] if he were innocent. Thus, instead of being asked to weigh the evidence with an open mind, the jury was told to consider as a factor the prosecutor's statement that she, as a Black woman, would only prosecute a Black person who she **knew** to be guilty. By doing this, the prosecutor improperly influenced the jury by arousing their prejudices.

Brief of Appellee, at 11-12 (emphasis in original). Brice alleges that, "by telling the jury she **knew** [Brice] was guilty, the prosecutor hinted that there [may] be some other evidence that exists but simply could not be presented at trial." *Id.* at 17 (emphasis in original).

Brice further argues that the trial court's instruction to disregard the prosecutor's statement was insufficient, as "some statements . . . are too prejudicial to be 'unheard.'" *Id.* at 12. Moreover, Brice asserts, the Commonwealth's assertion that any error was harmless because the Commonwealth's case was "virtually airtight" is belied by the fact that the prosecutor "resort[ed] to such despicable tactics" and "put her thumb on the scales of justice." *Id.* at 13, citing **Scarfo**, **supra** ("There is no reason for such base assertions by a prosecutor when he can rely on a case as strong as this one."). Brice argues that "the Commonwealth presented a circumstantial case that was contradicted by both the victim and by the only eyewitness. There can be no doubt in the face of such thin eviden[c]e that the unavoidable effect of this statement was to prejudice the jury." *Id.* at 16.

Upon careful review of the record, we conclude that the prosecutor's remarks, while unwise and inappropriate, did not impede the jury's ability to weigh the evidence objectively and render a fair verdict. We are mindful of the fact that we must view the prosecutor's comments in the context in which they were made. **Jones**, **supra**. Trial in this matter was extremely hard fought and, at times, the relationship between counsel became contentious. Particularly at sidebar discussions with the judge, the exchanges between counsel became heated and tested—sometimes crossing—the boundaries of professionalism and civility.[1] While both counsel's behavior was, at times,

---

[1] On numerous occasions, the trial judge was compelled to tell counsel to "take it down a notch." **See** N.T. Trial, 4/25/22, at 169; **id.**, 4/26/22, at 11, 16, 39; **id.**, 4/27/22, at 82, 146; **id.**, 4/29/22, at 21. The following exchange at sidebar is one of the more egregious examples of the outright hostility between counsel and the court's failure to adequately address the issue:

> MR. ALTSCHULER: I still would like to know, because we're hearing so much double talk, has the witness been served with a subpoena? That's a critical question.
>
> MS. WYNNE: You just heard me say—
>
> THE COURT: No.
>
> MS. WYNNE: —that somebody went to his house, a verified address, to give him a subpoena and was not able to make contact. You also heard me say—
>
> MR. ALTSCHULER: So, when I said before he wasn't served and you said, you don't know. You don't know. You just lied. You can't stop lying.
>
> MS. WYNNE: I did not lie and don't you dare—
>
> THE COURT: Stop it.

*(Footnote Continued Next Page)*

MS. WYNNE:  Judge, this is what—

THE COURT:  That's it.  I'm walking out.  The record is done.

MS. WYNNE:  You're not going to sit back here and call me a liar.

MR. ALTSCHULER:  Well, then stop lying.

MS. WYNNE:  This is exactly what I was talking about yesterday, Judge.

THE COURT:  Calm down.

MR. ALTSCHULER:  This is absurd.

MS. WYNNE:  This is exactly what I was talking about yesterday.

THE COURT: Both of you calm down or you know what I am going to—I can't have it and I'm just going to—we're going to stop.  We're going to go out and you two can yell at each other back here off the record.  How's that?

MS. WYNNE:  I don't want to yell at anybody.  Like I said—

THE COURT: Okay.  Let's stop.  Let's stop even arguing.

MS. WYNNE:  Judge, may I?  I don't want to argue with anyone—

THE COURT:  I don't want to waste time.

MS. WYNNE:  I don't want to yell.  I don't want to waste time.  This trial should have been done days ago.  But like I said, Your Honor, I am not going to allow Mr. Altschuler—this is exactly what I was talking about, and I want the record to be clear, I will not—

MR. ALTSCHULER:  It is clear.

MS. WYNNE:  —allow Mr. Altschuler to call me a liar as I'm trying to explain and answer Your Honor's questions.

THE COURT:  Okay.

MS. WYNNE:  And that is what is happening.  This is beyond just the case, which is what my issue was yesterday.

*(Footnote Continued Next Page)*

- 12 -

discourteous and unprofessional, defense counsel repeatedly resorted to name-calling and insulting language aimed at the prosecutor and her colleagues. In particular, defense counsel referred to the prosecutor's supervisor, who was in the courtroom during a discussion outside the presence of the jury, as a "doofus" and a "clown" and told him to "shut [his] mouth," N.T. Trial, 4/26/22, at 16-17; suggested at sidebar that the prosecutor "maybe hasn't read the constitution," *id.* at 37; and, again at sidebar, asserted that the prosecutor "can't stop lying." *Id.*, 4/27/22, at 35. For her

---

THE COURT: I remind you both of the rules of civility. There's a certain amount of contentiousness that does go on that I have no control over if it happens when I don't know that's going to happen and then it pops out. Okay.

MS. WYNNE: Right, but when it pops out, Your Honor can nip it in the bud that it's unprofessional and it's unnecessary.

THE COURT: Well, it is.

MS. WYNNE: Just like being called a liar back here is unnecessary and unprofessional.

THE COURT: It is, but there is also the point of we did ask you whether or not he was served and there was no—you didn't give us an answer. Because I guess you were still trying to serve him up until today?

MS. WYNNE: Yes. I didn't want to make a misrepresentation to the Court.

THE COURT: Okay. So, now, let's move on because I've had it. Let's move on. I want to get this case moving successfully ahead in the right time frame. Let's go.

N.T. Trial, 4/27/22, at 34-37.

part, the trial judge failed to properly rein counsel in and ensure that they adhered to the canons of civility. As a result, tempers continued to flare throughout the course of the trial.[2]

At the conclusion of this contentious proceeding, during his closing argument, defense counsel made numerous disparaging remarks against the Commonwealth and, in particular, the prosecuting attorney. At trial, the parties stipulated that, if called to testify, the victim's wife would testify that Brice was not the person who shot her husband. However, during his closing remarks, defense counsel alleged that the Commonwealth "hid" the victim's wife from the jury. *See* N.T. Trial, 4/28/22, at 100. Defense counsel also accused the prosecution of hiding another eyewitness from both the defense and the jury, *see id.* at 101-02; accused the prosecutor of intending to prepare the victim to lie, *see id.* at 106; accused the prosecution of "manipulating videos, changing things around," *id.* at 108; accused a police officer of testifying to "made up . . . nonsense," *id.* at 111; referred to the prosecutor as "pathetic" and "desperate" and being willing to "say anything," *id.* at 107, 111; called the Commonwealth's case a "train wreck," *id.* at 114; and asserted that the prosecutor's closing argument would contain "misrepresentations." *Id.* at 114.

In an effort to defend against opposing counsel's comments impugning the integrity and professionalism of herself, the police, and the district

---

[2] We note that, throughout trial, both counsel were able to act in a civil manner while in the presence of the jury.

attorney's office, the prosecuting attorney, albeit in an injudicious manner, attempted to reference the well-known progressive, reform-oriented policies of Philadelphia District Attorney Larry Krasner to refute defense counsel's insinuation that Krasner's office essentially conspired with the police to railroad his client.[3] We agree with Brice that the prosecutor's reference to her own race and that of the defendant was wholly unnecessary and inappropriate, particularly in light of this country's historical and ongoing issues involving racism and, in particular, the disparate treatment of Black Americans by police and the criminal justice system as a whole. However, viewed in the context of both the trial as a whole and defense counsel's closing argument, it is apparent the statement was not meant as an attempt to inflame racial passions or "appeal to the prejudices and biases of the jury[.]"[4] Brief of Appellee, at 13. Rather, the prosecutor spoke out of frustration borne of what she perceived to have been "problematic," "abusive," and "deeply inappropriate" behavior by defense counsel. N.T. Trial, 4/28/22, at 157-58.

"[T]he polestar of this matter is whether the jury was prejudiced to the point where the prosecution's comments instilled a fixed bias and hostility

_____

[3] In response to defense counsel's objection to her statement, the prosecutor stated: "I said DA[] Larry Krasner, the office, as counsel has been trying to state that this is all some theory and exercise to take down Mr. Brice, and that the police, as well as myself, are in cahoots with that." N.T. Trial, 4/28/22, at 130.

[4] Indeed, the trial court at first denied Brice's motion for mistrial, opining that "I think [the bell] can be unrung. I think that it was inappropriate, but I think that I can unring that [bell] by doing a cautionary instruction." N.T. Trial, 4/28/22, at 153.

toward the defendant[.]" **Scarfo**, 611 A.2d 282. Here, the animosity that was exhibited between counsel during sidebar discussions held out of view of the jury did not rear its head while the panel was present. Thus, counsel's behavior cannot be deemed to have impacted the jury's view of Brice or its deliberations. Moreover, immediately following the prosecutor's statement, the trial court instructed the jury to strike the comment from their minds. **See** N.T. Trial, 4/28/22, at 131. Additionally, the trial judge began her closing instructions to the jury with the following statement:

> Members of the jury, ladies and gentlemen of the jury, now that all the evidence has been presented and the attorneys for both sides have made their closing arguments, it becomes my duty to instruct you on the law that you will apply to the facts as you find them in reaching your verdict.
>
> Now, I want to start out by saying that during the closing argument, the prosecutor—and, look, these are great lawyers and they are advocates.
>
> The prosecutor made reference to something that I—was objected to and I sustained the objection and said it had to be stricken from your mind[s]. That was a reference to the DA's Office, Larry Krasner's DA's Office and this climate and stated that in the current climate that a Black person, [a] Black female prosecutor would not prosecute a Black defendant if it weren't true.
>
> I want you to know that those comments—and I'm sure it was just made in a heat of the moment—but they're highly inappropriate in that they may not be considered by the jury and in the jury deliberations. Not one iota may something like that be even part of your deliberations.
>
> And as I sustained the objection and struck it from the record, that is the law, as you'll hear me state, and I think I said that before that once an objection is sustained and stricken, you may not consider it. So, I reiterate that because it can be highly prejudicial.

*Id.* at 167-68. Juries are presumed to follow a court's instructions. ***Commonwealth v. Naranjo***, 53 A.3d 66, 71 (Pa. Super. 2012).

Finally, even if the prosecutor's comment amounted to misconduct, we conclude that it was harmless error in light of the overwhelming inculpatory evidence presented by the Commonwealth at trial and the vigorous defense presented in response thereto. ***Caldwell***, ***supra*** (prosecutorial misconduct evaluated under harmless error standard).

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Hairston***, 84 A.3d 657, 671–72 (Pa. 2014) (citations omitted). "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." ***Commonwealth v. Hairston***, 84 A.3d 657, 671 (Pa. 2014).

Here, the video evidence admitted at trial provided uncontradicted and overwhelming evidence of Brice's guilt. Prior to the shooting, on the morning of June 13, 2019, Brice was recorded at Lou's Wholesale[5] in South Philadelphia wearing a dark gray hoodie with a white shirt underneath, dark jeans with a

---

[5] After the shooting, during a warranted search of Brice's black Honda, police recovered a receipt from Lou's Wholesale, which led to the discovery of the video evidence showing Brice in the store.

distinctive white line and tear on the left leg, and dark running shoes with some areas of white. *See* Commonwealth Exhibit C-32,[6] at 00:25-03:26. The video provides numerous clear views of Brice's face. *See id.* at 01:22, 01:45-01:48, 01:53-01:54, 03:03-03:25. Video recorded later that day from surveillance cameras at the Phong Grocery, located at 1519 Reed Street, kitty-corner across the street from the site of the shooting, shows a black two-door Honda Accord with tinted windows back up from Reed Street into a parking spot on South Hicks Street. *See id.* at 04:02-04:32. That same video shows an individual appearing to be wearing clothes identical to those worn by the person in the Lou's Wholesale video exiting the black Honda, walking across the street, lingering, and returning in the direction of the black Honda. *See id.* at 04:44-05:05, 05:29-06:00. Other, clearer footage taken from a different angle by a camera affixed to a private residence located at 1518 Reed Street, across from the Phong Grocery, shows the same individual, clearly wearing the same clothes as the person in the Lou's Wholesale video, lingering at the intersection of South Hicks and Reed Street. *See id.* at 06:10-06:46. The Phong Grocery video then shows the individual returning to the black Honda and reentering the passenger compartment through the driver's-side door. *See id.* at 07:03-07:12.

Thereafter, a second car pulls up and parks in front of the black Honda. *See id.* at 08:23. The victim is then shown after emerging from the driver's

_____

[6] Commonwealth's Exhibit 32 is a compilation video distilling all the surveillance video obtained by police during their investigation.

side of the second car. He begins to walk, at which time the individual in the Honda exits his vehicle and begins shooting at the victim. *See id.* at 08:37-08:41, 08:43-09:17. The victim flees on foot down Reed Street, at which time the shooter gets back into the black Honda and drives away, also down Reed Street. *See id.* at 09:17-09:51. Video footage from the residence at 1518 Reed Street, taken as the Honda drives away, shows damage to the driver's-side rear of that vehicle. *See id.* at 10:15-10:22. Other footage from a residence at 1620 Reed Street (at the corner of Reed and South Bancroft Streets) captures audio of the shooting, *see id.* at 10:38-10:43, followed by an image of the black Honda turning quickly from Reed Street onto South Bancroft Street. *See id.* at 11:42-11:48.

Additional footage from a residence at 1410 South Bancroft Street shows the black Honda being parked on South Bancroft Street and a person wearing clothing identical to the shooter emerging from the vehicle and proceeding to walk down South Bancroft Street. *See id.* at 12:21-12:57. The shooter—now having removed his hoodie—is subsequently seen walking back up South Bancroft Street, past his black Honda, in the direction of Reed Street. *See id.* at 13:49-14:12, 14:38-15:00. He is then seen entering a residence on Reed Street with three other men. *See id.* at 15:40-15:56. Approximately 30 seconds later, one of the other men is seen exiting the Reed Street residence, walking to the black Honda, appearing to retrieve an item from the vehicle, and walking back in the direction of Reed Street. *See id.* at 16:22-17:41. A few seconds later, the man turns around, runs back to the black

Honda, appears to retrieve another item, and then returns to the Reed Street residence. *See id.* at 17:57-18:13. Ultimately, a police officer is seen arriving at the location of the black Honda and appearing to call for additional officers, who arrive shortly thereafter and begin inspecting the exterior of the vehicle. *See id.* at 21:41-23:47.

Police subsequently obtained a vehicle record abstract for the black Honda with tag number KSD7123, parked on South Bancroft Street, which indicated that it was registered to Brice. *See* Commonwealth Exhibit C-54 (PennDOT vehicle record abstract). The vehicle had damage to its rear driver's side, as shown in the surveillance video of the black Honda leaving the scene of the shooting. *See* Commonwealth Exhibit C-13(e) (photograph of driver's side of black Honda parked on South Bancroft Street).

In sum, the video surveillance footage tracked Brice's movements on the day of the shooting, beginning at Lou's Wholesale and ending on South Bancroft Street. Throughout each of the videos, Brice can be seen wearing the same distinctive clothing. The video footage, combined with the evidence of Brice's ownership of the black Honda, was overwhelmingly inculpatory.[7]

---

[7] Moreover, in the face of such objective, overwhelming, and uncontradicted video evidence, the jury could reasonably have disregarded the testimony of the victim denying Brice's responsibility for the shooting. *See Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000) (jury may believe all, some, or none of the evidence presented).

Further, as noted above, defense counsel forcefully challenged the Commonwealth's case at trial. Thus, in light of the foregoing, we are constrained to conclude that the trial court abused its discretion by granting Brice's motion for extraordinary relief, as any prejudicial effect caused by counsel's statement "was so insignificant by comparison that the error could not have contributed to the verdict." ***Hairston***, ***supra***.

Order reversed. Convictions reinstated. Case remanded for sentencing. Jurisdiction relinquished.

Panella, P.J.E., Joins the Memorandum.

Colins, J., Concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/25/2024